Estate of Rosie Giacopuzzi, Deceased, Lindo Giacopuzzi, Executor v. Commissioner.
Estate of Giacopuzzi v. Commissioner
Docket No. 4464-68.
United States Tax Court
T.C. Memo 1970-356; 1970 Tax Ct. Memo LEXIS 3; 29 T.C.M. (CCH) 1777; T.C.M. (RIA) 70356; December 31, 1970, Filed Frederick J. Kling, for the petitioner. Andrew H. Weinstein, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined a deficiency in estate tax of the Estate of Rosie Giacopuzzi in the amount of $45,027.15. The issues for decision are: (1) Whether the decedent's daughter Nellie Pomo paid part of the purchase price of decedent's last residence, which property was held by decedent and her daughter Nellie Pomo as joint tenants at the time of decedent's death. (2) Whether properties which were conveyed by decedent to herself and three of her children in joint tenancy were in fact intended to be conveyed in a different manner so that less than the entire value of the property would be includable in decedent's gr gross estate. (3) Whether *4 petitioner is entitled to a credit for State death taxes. Findings of Fact Some of the facts have been stipulated and are found accordingly. Rosie Giacopuzzi (hereinafter referred to as decedent) died testate on November 26, 1964. Her son, Lindo Giacopuzzi (hereinafter referred to as Lindo) was appointed executor of her estate. At the date of the filing of the petition herein Lindo resided in Reseda, California. Lindo filed a United States Estate Tax return on behalf of decedent's estate with the district director of internal revenue at Los Angeles, California. At the date of her death decedent had six living children, Lindo, Nellie Pomo, Erma Unruh, Alenta Vaona, Palma Abram, and Marie Giacopuzzi, each of whom will hereinafter be referred to by her first name. At the date of her death decedent was living in a house located at 531 Tufts Avenue, Burbank, California. Prior to the purchase of the house at 531 Tufts Avenue, decedent owned a house located at 19802 Sherman Way, Canoga Park, California. That house was sold in 1951 for $18,000 and after the sale, the house located at 531 Tufts Avenue was purchased for $18,000. Decedent's last will and testament which was filed *5 for probate in the Superior Court of the State of California in and for the County of Los Angeles, had been executed by decedent on April 14, 1958. The fourth paragraph of this will provided that the decedent devised and bequeathed "my real property located at 531 Tufts Avenue, Burbank, California, and all land used in connection therewith to my daughter, NELLIE POMO." However, by deed executed on September 29, 1958, and recorded in Los Angeles County on October 9, 1958, decedent granted to herself and Nellie, "a married woman as her separate property," as joint tenants the property located at 531 Tufts Avenue in Burbank, California. 1778 In 1938 Nellie was living with her mother and father in a home on Corbin Avenue in Los Angeles. Prior to 1938 the only work that Nellie had done was the picking of fruit or other farm work which she did together with the other members of her family. In 1938 Nellie obtained work as a beautician in a beauty shop in Reseda, California. She worked there for about a year and then opened her own beauty shop. Since 1927 Nellie's parents had owned approximately 10 acres of land on Sherman Way in Canoga Park, California. This land had been acquired *6 by Nellie's parents in 1927 at a cost of $1,000 per acre. During 1938 Nellie's father built a house on approximately a half acre of this property. The house cost approximately $3,500 and Nellie's father obtained a loan to defray part of the cost of construction of the house. Nellie moved into this house with her mother and father when the house was completed in late 1938 or early 1939 and she lived there with her parents until 1949 when she was married and left the family home to live with her husband. Nellie was 37 years old when she was married in 1949. After 1937 none of decedent's other children lived at home with decedent and decedent's husband. When decedent's children lived at home, it was their practice to turn most of any earnings they had over to their father. During the time Nellie was employed as a beautician in 1938 and while she operated her own beauty shop from 1939 through 1949 she would turn over to her father the money that she made other than amounts she kept for her necessary personal expenses and her personal clothing. She paid no amount as room and board as such to her parents and she was driven to and from her beauty shop by her father in his car. Nellie *7 was paid by the week in 1938 for her work as a beautician and her total salary was less than $1,000. When she began operating her own shop, she would keep money from her receipts to open up and operate the shop. Shampoos and waves at that time were 25 cents. In 1941, Nellie took in a gross of over $1,000 from the operation of her beauty shop. From this amount she paid her expenses for supplies and rent and other necessary costs of running the shop. She was a sole proprietor and did not employ any other beautician. When Nellie would give money to her father he would put it into his pocket and intermingle it with his own. During the years 1938 through 1949 Nellie's father had a bank account in which he deposited money. In 1938 Nellie's father was renting his dairy property for approximately $125 a month and was farming the property on Sherman Way in Canoga Park, on which the house to which he, decedent and Nellie moved was built. He continued to farm the property after they moved into the house. At one time while Nellie was living with her mother and father, her father stated to her that because she was turning her money over to her parents, they would leave her the house. Nellie's *8 father died in 1951 shortly after the house on Sherman Way was sold. At the time of his death he was negotiating for the sale of the balance of the acreage on Sherman Way and the sale was consummated by decedent after her husband's death. For many years prior to the death of decedent's husband in 1951, she and her husband had owned 10 acres of property known as 6841 Corbin Avenue, Canoga Park, California, on which a dairy operation was carried on and which the parties referred to as the dairy property. It was on this 10-acre dairy parcel that decedent and her husband had lived prior to moving in late 1938 or early 1939 to the Sherman Way property. After her husband's death, decedent continued to hold this property. In 1957, Lindo, who at that time was a police officer, was talking with a friend of his by the name of Guido E. Poli about the disposition of property. Poli told Lindo that his parents had turned their property over to him and his brother. Poli suggested to Lindo that his mother should do the same thing and gave him the name of an attorney who had done the work for his family. Lindo at that time was working with another police officer by the name of Pat Long. Lindo *9 knew that Pat Long had a brother who was an attorney who had worked for a number of years with the Internal Revenue Service. Lindo spoke to Pat Long about his though that his mother should turn over her property to her children and Pat made Lindo an appointment with his brother, Dermot Long. Lindo went to see Dermot Long and told him that his mother wanted to transfer her property to her children in the same way that the Poli's had done, so that in that way they could avoid probate at the time 1779 of his mother's death. Dermot Long took certain notes during his discussions with Lindo. On these notes there appeared a rough drawing of a rectangle across which was written, "10 acres." Two broken lines were drawn vertically through this rectangle forming three smaller rectangles and in one of the rectangles thus formed was placed the figure "4" and in each of the other two, the figure "3." The notes also contained the following "Ma 10 ac," "Son 4," "Dau 3," and "Dau 3." They also contained "D to Res Life Estate"and "Reserve - Life Estate." Notations were made on the notes of the names of Rosie, Lindo, Nellie, and Erma; also, "Life Estate to Ma," "Estate Tax," "Gift Tax," "Protect *10 spouses on income," "Protect VS Spouses on divorce or d -," and "protect Income." In the early part of May 1958 there was a fire in the law offices of Dermot Long and many of his records were charred or partially burned. The notes which he took in his conference with Lindo were partially burned and there were obviously certain notations on them that are no longer legible. Under date of January 21, 1958, Dermot Long addressed a letter to Lindo which was headed, "In re: Acreage." The body of this letter was as follows: My determination of the proper handling of this situation is as follows: The appraised valuation for inheritance tax in 1951 was $25,000.00 and the tax assessed valuation is $31,000.00 as of the present time. Estimating the true market value at approximately $60,000.00 for the purpose of establishing gift, and if she retains a joint tenancy interest, or 1/2 interest in said property, she would be making a gift of only $30,000.00 to the children. Under Federal law she is entitled to a specific examption [sic] of $30,000.00, plus $3,000.00 per child per year, so that in any one year she can give $39,000.00. The California rates are not as generous and the child is *11 allowed $5,000.00 exemption and a $4,000.00 exclusion in any one year. Therefore, a survey should be taken so that the four (4) acre parcel to yourself could be set forth by legal description. Then your mother could convey to herself and you, as joint tenants. This would necessitate the filing of a Federal Gift Tax Return, but no tax due. It would necessitate the filing of a State Gift Tax with approximately $60.00 due. Then, one three acre tract would be given by your mother to herself, Nellie and Erma, as joint tenants, and there would be no tax due on the Federal or State Gift Tax Returns. Then the other three acre tract would be given by your mother to herself, Nellie and Erma, as joint tenants. No tax due on Federal or California Gift Tax Returns. This will result in a tax of approximately $60.00 at this time. When your mother has gone there would be three separate filings for termination of Joint Tenancy but the deductions and exemptions would be so low that the surtax bracket would be substantially defeated. At the same time there is only the remotest possibility that either of you three, your sisters and your mother could go at the same time, so that the property *12 might pass into hands other than your immediate family. From the viewpoint of protecting the property, avoiding excessive taxation and ultimately reaching the goal you desire to achieve, I believe the above procedure is advisable. After you have a chance to consult with your family, please advise me as to the disposition, and the creation of the Deeds and transfers can be affected. You will note that the zoning condition runs with the land and is not affected by the title, so there is no danger as to this destroying a profitable business venture for you. After Lindo received the letter from Dermot Long, he, decedent, Nellie, and Erma went to Dermot Long's office. They had a discussion and the decedent signed three separate deeds, each entitled, "Joint Tenancy Grant Deed." These deeds were handed to her for signature by Long. These deeds were executed by decedent on March 28, 1958, and were notarized by Dermot R. Long. One of the deeds recited that decedent granted to herself and Lindo, "a married man as his separate property," as joint tenants certain real property which is described therein and is stated to contain 4 acres. The description of the property is the description *13 of a part of the dairy property. Each of the other two deeds recites that decedent grants to herself and to Nellie, "a married woman as her separate property," and Erma "a married woman as her separate property," as joint tenants, real property which is described therein. The property described in each of these deeds is a 3-acre parcel of the dairy property. Each of these deeds was recorded in the recorder's office in Los Angeles County, California on April 2, 1958. In August 1961, decedent executed a lease of all 10 acres of the real estate 1780 described in the three joint tenancy deeds to Corbin Dairy Co., Inc., for a period of 2 years. The name of no one other than decedent is in the lease as lessor. In 1961 this lease was extended to July 31, 1971, by an amendment to lease and the decedent appears on the "Amendment to Lease" as the sole lessor. The monthly rental received under the lease with Corbin Dairy Co., Inc., was split evenly between decedent and Lindo. None of the income went to decedent's daughters. Decedent's will bequeathed her personal effects to Nellie, a special money bequest to Palma, Alenta, Marie, Nellie, and Erma each, and bequeathed the residue and remainder *14 of her estate to her children share and share alike. The will appointed Lindo as executor. It was Lindo's opinion that no money bequest was left to him since he had been receiving rent from the dairy property. At the date of the trial of this case, neither Lindo, Nellie, or Erma, nor anyone on their behalf had filed any action in a State court or in any other court to have the joint tenancy deeds executed on March 28, 1958, reformed in any manner. Lindo's attorney in the instant case called Dermot Long sometime in 1967 to discuss with him the giving of an affidavit to the effect that he was instructed that one-half of the 4-acre parcel containing the dairy improvements was to be deeded to Lindo as his sole and separate property and one-half to decedent and Lindo as joint tenants, that the rental from the property was to be paid one-half to Lindo and one-half to decedent, that he was further instructed that the remaining 6-acre parcel was to be divided into two 3-acre parcels, both to be handled in the same way in that Nellie and Erma each was to receive outright one-third of each parcel, and the remaining one-third of each parcel was to be held in joint tenancy between Nellie, Erma, *15 and decedent. At that time Long did not have his files available since they had been placed in storage after the fire. Without having his files, Long considered this to be accurate and after getting a release from Lindo, Nellie, and Erma for any liability he might have to them because of any misunderstanding or error that might have occurred with respect to the drawing of the deeds, he signed an affidavit to the effect that he was instructed in the manner discussed and that the deeds which were prepared deeding the properties to Lindo, Nellie, and Erma and decedent in joint tenancy were so prepared through misunderstanding. After reviewing his notes he was of the opinion that his instructions were not as he had stated they were in the affidavit. Included in the property reported on the estate tax return on Schedule E under the heading "Jointly Owned Property," was the 531 Tufts Avenue property, with the notation "Contribution of survivor one half see attached affidavit," with the value of the other one-half being shown as $15,000. On Schedule A under Real Estate a valuation of $100,000 was placed on the 4-acre parcel of the dairy property, and one-half of that amount or $50,000 was *16 reported in the gross estate. A value of $75,000 was placed on each of the 3-acre parcels of the dairy property and of this valuation $25,000 for each property was included in the gross estate. The explanation in each instance was that although the property was held in joint tenancy, "property was never intended as joint tenancy in that it lacked the unity of interest in true joint tenancy, to wit, income and control." Respondent in his notice of deficiency increased the jointly owned property reported on Schedule E by $265,000 by including an additional $15,000 valuation of the 531 Tufts Avenue property and the total $250,000 valuation of the dairy property in petitioner's taxable estate. This amount was decreased by the $100,000 value of the dairy property which had been reported on schedule A. Opinion Section 2040, I.R.C. 1954, [1] provides for the inclusion in the gross estate of a 1781 decedent of property held as joint tenants by decedent and another person except such part as may be shown to have originally belonged to such other person or if the property was acquired by the other person from the decedent, such part of the value of the property *17 as is proportionate to the consideration furnished by the other joint owner. *18 The record is clear that the house at 531 Tufts Avenue originally belonged to decedent and that Nellie's interest in this house was acquired from the decedent by a joint tenancy deed whereby decedent conveyed the property to herself and Nellie as joint tenants. This deed bears a date of September 29, 1958 and was recorded on October 9, 1958. Since Nellie acquired her joint tenancy interest in this property from decedent, the value of the property is includable in decedent's gross estate except "such part of the valu of such property as is proportionate to the consideration furnished by Nellie." Petitioner in this case contends that Nellie did in fact furnish one-half of the consideration for the property at 531 Tufts Avenue. Petitioner argues that Nellie paid one-half of the cost of the house which her parents built on Sherman Way in Canoga Park, California, that in 1951 the proceeds from the sale of that house were used to purchase the house on Tufts Avenue in Burbank, California, and that therefore Nellie is to be considered as having furnished one-half of the consideration for the house on Tufts Avenue which she held in joint tenacy with decedent at the time of decedent's death. *19 After consideration of all the evidence produced in this case, we conclude that petitioner has totally failed to establish that Nellie furnished one-half of the consideration or any portion of the consideration for the acquisition of the house on Sherman Way in Canoga Park, and therefor do not reach any further question with respect to this property. The evidence shows that all of decedent's children, when they lived at home, turned over whatever earnings they had, except possibly amounts kept for personal items, to their parents and that their parents furnished them with room, board, and other necessary items of support. At the time in 1938, when construction was begun on the Sherman Way house, Nellie was the only one of decedent's children living at home. She worked for one year as a beautician and for the remainder of the time from 1938 through 1949 she was the sole proprietor and only beautician in a small beauty shop. The only year in which even the gross receipts from the operation of Nellie's beauty shop are shown is the year 1941 when Nellie stated she took in over $1,000. From the amount Nellie took in at the beauty shop in 1941 and in all of the other years during which *20 she operated the beauty shop, she paid the cost of operating the shop such as the cost of supplies and rent. The record nowhere shows the amount of these costs so that there is no evidence of the amount of Nellie's net income in any of the years here in issue. The record shows that from whatever net income Nellie did have from her work as a beautician or from her own beauty shop, she purchased her clothing and defrayed certain other personal expenses. The amount of such expenses is at no point shown in the record although at one juncture she did state that she "imagined that she bought a lot of clothes." The record also shows that Nellie was 37 years old in 1949 when she married, that she had lived the entire 37 years with her mother and father but had not worked, except for farm work done with other members of the family, until 1938 when she started working as a beautician. The record not only does not show how much money Nellie gave to her father while she was living at home, it does not show how that money would compare to the value of her room and board and transportation which were furnished to her by her parents during all of these years. The record does show that Nellie had *21 just started to work at the time the house on Sherman Way was built in 1938 so under no circumstances could she have furnished any appreciable portion of the funds that were actually used to construct the property. The record does not show the amount of the loan obtained by Nellie's parents to construct the home although there is testimony that there was some loan. The record does not show how the loan on the property was repaid, whether with cash payments or by check on the bank account of Nellie's father. 1782 Nellie thought that her father deposited the funds that she gave him in his bank account. However, there is no showing that the funds from this bank account went to pay off whatever loan Nellie's father might have obtained to construct the Sherman Way house. Apparently petitioner is relying to an appreciable extent on the statement Nellie made that her father told her that because "I did get - I was giving himg all this money, that they would leave me the house." This statement is not a statement that any of Nellie's money was used to pay for the house. The evidence as a whole fails to show that any part of the consideration with which the Sherman Way property was acquired *22 was from consideration furnished by Nellie. Because of petitioner's failure of proof, we sustain respondent's determination. Petitioner does not contend that Lindo, Nellie, or Erma furnished any consideration for the dairy property. Petitioner's contention in connection with this property is that the deeds placing 4 acres of the property in joint tenancy of decedent and Lindo and the other 6 acres in joint tenancy of decedent and Nellie and Erma should not be considered to be in accordance with the intent of decedent. Petitioner primarily argues that decedent intended to make an outright gift of two acres of the property to Lindo and 4 acres to Nellie and Erma jointly and that the attorney who drew the deeds did not draw them in accordance with decedent's intent. Petitioner on brief argues that if it is assumed that the instructions to Long called for a life estate of the whole property in decedent with the remainder to her children, the same result as to the value of the property includable in decedent's gross estate should follow under the facts of this case. If the record were sufficient to show a clear intention on the part of decedent to make an outright gift of one-half of *23 the dairy property to her children and retain a joint tenancy interest with them of only the other one-half, it would be necessary for us to decide whether the property at the date of decedent's death could be considered to be held in accordance with the intent of decedent as distinguished from the legal manner in which it was actually held. See Helvering v. Miller, 75 F. 2d 474 (C.A. 2, 1935), affirming 29 B.T.A. 470 (1933). This is an issue we do not reach since the evidence in this record is totally insufficient to establish petitioner's contention that decedent's intent was otherwise than as shown by the deeds which she actually executed and recorded. The evidence is totally devoid of any evidence of decedent's intent as distinguished from the manner in which Lindo may have intended to direct the attorney with whom he talked to prepare the deeds. We have carefully reviewed the record for any evidence that decedent instructed Lindo with respect to the directions he was to give the attorney or that the decedent ever with respect to the directions he was to went to the office of the attorney except on the date that she signed the deeds. There is no evidence *24 of any statement decedent may have made on that day or any other day as to her intent. There is no evidence in the record of decedent's intent except her action in executing the deeds. The parties stipulated: Late in 1957, the decedent and her son, Lindo, first consulted Mr. Dermot Long, an attorney at law, for advice on how to dispose of certain real estate owned by the decedent as her separate property prior to that time. However, the testimony is than Lindo was the only person who went to see Dermot Long in late 1957 and that decedent went only in March 1958 when the deeds were signed. If we accept the stipulated facts, it is no help to petitioner since there is no indication from the evidence that if decedent were present at the original conference with Dermot Long she made any statement. The notes of that conference maintained by the attorney make no reference to any outright gift to any portion of the property to Lindo, Nellie, or Erma. Lindo's testimony of what he told the attorney is very confusing. The conclusion that might be drawn from his testimony is that he does not know what he stated to the attorney other than telling the attorney about his discussion with his friend *25 Guido E. Poli and that he wanted to put the property in a manner to avoid probate. The testimony of Dermot Long is of no help to petitioner. The substance of his testimony is that he does not have any independent were and can only rely on his notes which are far from complete because of the fire that occurred in his office and the letter of January 21, 1958, which he wrote to Lindo to form [EDITOR'S NOTE: The Document appears as received from the Court.] Footnotes
1. All references are to the Internal Revenue Code of 1954. SEC. 2040. JOINT INTERESTS. The value of the gross estate shall include the value of all property to the extent of the interest therein held as joint tenants by the decedent and any other person, or as tenants by the entirety by the decedent and spouse, or deposited, with any person carrying on the banking business, in their joint names and payable to either or the survivor, except such part thereof as may be shown to have originally belonged to such other person and never to have been received or acquired by the latter from the decedent for less than an adequate and full consideration in money or money's worth: Provided, That where such property or any part thereof, or part of the consideration with which such property was acquired, is shown to have been at any time acquired by such other person from the decedent for less than an adequate and full consideration in money or money's worth, there shall be excepted only such part of the value of such property as is proportionate to the consideration furnished by such other person: Provided further, That where any property has been acquired by gift, bequest, devise, or inheritance, as a tenancy by the entirety by the decedent and spouse, then to the extent of onehalf of the value thereof, or, where so acquired by the decedent and any other person as joint tenants and their interests are not otherwise specified or fixed by law, then to the extent of the value of a fractional part to be determined by dividing the value of the property by the number of joint tenants.↩